# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE LEIGH LACHNER,<br><br>Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,<br><br>Defendant.<br>_____/ | Case No. 1:22-cv-01464-SKO<br><br>ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>(Doc. 1) |

## I.   INTRODUCTION

Plaintiff Michelle Leigh Lachner ("Plaintiff") seeks judicial review of a final decision of the Acting Commissioner of Social Security (the "Acting Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.   FACTUAL BACKGROUND

On September 4, 2018, Plaintiff protectively filed an application for DIB payments, alleging she became disabled on March 28, 2017, due to left total knee replacement failure, back pain, right shoulder pain and numbness, carpal tunnel of both hands, bilateral hip pain, osteoarthritis, right knee pain, left ankle pain, headaches, and depression. (Administrative Record ("AR") 20, 80, 81, 99, 116, 248.)  Plaintiff was born on May 18, 1974, and was 42 years old on the alleged onset date. (AR 34,

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 10.)

80, 98, 245, 282, 302.)  She has at least a high school education and has past work as a medical assistant and a receptionist.  (AR 34, 249, 250.)

**A.	Relevant Medical Evidence[2]**

In June 2017, Plaintiff presented to a clinic complaining of back (thoracic) pain.  (AR 537–41.)  She was diagnosed with chronic thoracic back pain and prescribed pain medication.  (AR 541.)  Plaintiff was also referred to a pain management specialist and was recommended to undergo injections.  (AR 541.)  An x-ray performed that month showed abnormal alignment, levoscoliosis, degenerative disc changes, and abnormal in the facet joints.  (AR 392.)

Plaintiff had a total left knee replacement in 2010.  (AR 516.)  In August 2017, Plaintiff reported to the emergency department complaining of left knee pain.  (AR 453–54.)  She reported having sustained a fall while walking.  (AR 516, 1361.)  An x-ray showed a "large joint effusion present" and "lucency . . . suggesting particle disease" within the proximal tibia.  (AR 455, 507, 516.)  At a follow up appointment with her primary care physician, it was noted that Plaintiff "continues to have difficulty walking and is wearing a knee brace."  (AR 516.)  Tenderness and swelling in Plaintiff's left knee was observed.  (AR 516.)  She was referred to an orthopedist.  (AR 517.)

Later in August 2017, Plaintiff presented for an evaluation with an orthopedist.  (AR 1361.)  He noted that Plaintiff's kneecap "does not seem 'out of place'" and there was no clicking, grating, or "sensation of something floating" in the knee.  (AR 1361.)  Plaintiff had abnormal range of motion.  (AR 1361.)  The orthopedist gave her a prescription for a hinged knee brace, and noted she "has crutches and will continue to remain non weight bearing for [six] weeks."  (AR 1361.)  At a follow up appointment with the orthopedist in September 2017, it was noted Plaintiff was "doing well" and wearing the knee brace "faithfully" yet she continued to be weight bearing despite recommendations to the contrary.  (AR 1362.)  An x-ray imaging study showed Plaintiff's preexisting arthroplasty in "good alignment" and a distal femur fracture healing with no deformity.  (AR 1362.)  Her primary care physician noted that same month that Plaintiff was "doing better with

---

[2] As Plaintiff's assertion of error is limited to the ALJ's consideration of Plaintiff's subjective complaints, only evidence relevant to this argument is set forth below.

2

[her] left knee fracture" and was using crutches. (AR 683.) In October 2017, the orthopedist noted Plaintiff's knee felt "stable." (AR 1363.) He recommended that she ambulate with crutches until mid-November. (AR 1363.)

Plaintiff was referred to a spine surgeon for her chronic thoracic back pain in February 2018. (AR 488, 673.) In March 2018, Plaintiff's primary care physician administered an injection for thoracic pain. (AR 668–69.) That same month, Plaintiff presented to a spine specialist for a consultation. (AR 390–95.) She reported that the severity of her thoracic spine pain was a six out of ten, and it prevented her from sitting for more than 30 minutes, standing, or performing household chores. (AR 390) On examination, Plaintiff's thoracic spine alignment was noted as abnormal with presence of scoliosis. Tenderness to palpation and muscle spasm was noted. (AR 392.) The provider concluded that Plaintiff would "benefit from a spine injection, the usage of spine orthotic brace, physical therapy, ergonomic modifications, and from weight loss." (AR 393.)

In May 2018, Plaintiff presented to the emergency department for left knee pain. (AR 456–47.) A CT image showed a large effusion. (AR 457.) From July to October 2018, Plaintiff complained of worsening left knee pain that radiated to the ankle and hip, which interfered with her ability to ambulate and to complete activities of daily living. (AR 579–603.)

Plaintiff underwent revision surgery of the left total knee arthroplasty in November 2018. (AR 884–962.) She was discharged after a few days in the hospital with the use of a front-wheeled walker. (AR 907, 923, 936–37.) At a follow up appointment a few weeks later, X-ray studies showed normal alignment of Plaintiff's left knee and the orthopedist concluded that both her examination and imaging studies "look good." (AR 984.)

In December 2018, Plaintiff underwent a consultative mental evaluation by a psychologist. (AR 1672–76.) She reported that she needed no help bathing, dressing, and grooming. (AR 1674.) She travels alone, can manage money, and can prepare food for herself. (AR 1674.) Plaintiff reported that, during a typical day at home, she does light chores, watches television, and cares for her children, especially her four-year-old son. (AR 1674.)

Following her surgery, Plaintiff began outpatient physical therapy for her left knee. (AR 1052.) She ambulated with axillary crutches or a front-wheeled walker, and described her pain as

"mild to severe." (AR 1052.)  In January 2019, after ten therapy sessions, Plaintiff was making "good progress" and reported "about 40% improvement since [her] initial evaluation." (AR 1065.) She was ambulating with a single axillary crutch and limited weight bearing on her left leg. (AR 1065.)  It was recommended that she continue physical therapy in "order to continue to address remaining deficits with knee [range of motion] and strength to improve her functional capacity/mobility." (AR 1065.)

In February 2019, Plaintiff presented for a follow-up appointment with her orthopedist. (AR 1068–71.)  She complained of discomfort in her left knee with activity, rated a 2 out of 10 in intensity, that was relieved with medication. (AR 1068.)  She was noted to be "progressing through physical therapy" and ambulating with a cane. (AR 1068.)  On examination, Plaintiff exhibited a range of motion of 5 to 125 degrees in her left knee, with a "minimal effusion" observed. (AR 1070.) X-ray studies of Plaintiff's left knee were unchanged. (AR 1070.)  Later that month, Plaintiff reported to her physical therapist an increased ability to stand and demonstrated improved range of motion. (AR 1166, 1167.)  Her pain increased with activity, such as "bending down doing laundry and dishes." (AR 1168.)

Plaintiff continued with physical therapy for her left knee in March 2019. (AR 1568–69.) During one session, she reported that she had attended a "monster truck" show and climbed 20 stairs. (AR 1577.)  Plaintiff complained of increased pain with activities of daily living, standing, and ambulating, yet reported "feeling 80% better since starting treatment." (AR 1568, 1569.)  It was also noted that Plaintiff "has made fairly good progress with physical therapy," with improved range of motion yet "continued limitation," improved strength yet muscular weakness, limited gait mechanics, and poor weight acceptance. (AR 1569.)  Eight additional physical therapy sessions were recommended. (AR 1569.)

In May 2019, Plaintiff presented to a spine specialist complaining of thoracic back pain. (AR 1380–84.)  An examination noted Plaintiff's abnormal thoracic spine alignment and scoliosis, tenderness to palpation, muscle spasm, and antalgic gait. (AR 1381.)  She received bilateral medial branch blocks in her thoracic spine in June 2019. (AR 1350–51.)  At a physical therapy appointment in July 2019, Plaintiff demonstrated limited thoracic range of motion with pain and "severe thoracic

4

kyphosis." (AR 1548.)  That same month, Plaintiff reported that the June 2019 medial branch block injection provided pain relief of less than 50 percent, but the results were not lasting.  (AR 138.)

In August 2019, Plaintiff continued to complain of severe thoracic spine pain.  (AR 1563.) At one physical therapy session, she reported that she had gone "school shopping with her kids" and that she "was walking more than she normally would." (AR 1556.)  At another, Plaintiff reported that she was "shopping/walking for about one hour . . . that caused her to have a lot of pain afterwards." (AR 1560.)  It was noted she "has made poor progress with physical therapy" for her back.  (AR 1564.)  Plaintiff demonstrated "slight improvement" in thoracic spine flexion and extension range of motion, though "rotation and sidebending have regressed since initial evaluation." (AR 1564.)

An MRI of Plaintiff's thoracic spine performed November 2019 showed findings "suggestive of a chronic fracture of the T6 vertebral body" and "mild deformity of the spinal cord" and "mild associated degenerative changes" at T6-T7.  (AR 1179.)  No "high-grade spinal canal stenosis" or "significant thoracic discogenic disease" was observed.  (AR 1179.)  Another MRI performed in March 2020 showed "mild to moderate multilevel thoracic spondylosis, most prominent at the T6-T7 leve1," with associated T7 levoscoliosis." (AR 1181.)

In April 2020, Plaintiff presented to a pain specialist for an evaluation of her back pain.  (AR 1683–87.)  She reported that she needed a cane to ambulate and that her severe and constant pain affected her ability to do "everything." (AR 1686.)  She received an epidural steroid injection in her thoracic spine that month.  (AR 1693.)  Plaintiff reported that she had over 50 percent improvement in her pain and activity level for over three months following the injection.  (AR 1682.)  Plaintiff received another round of epidural steroid injection in her thoracic spine in January 2021.  (AR 1689.)

In March 2021, Plaintiff presented for a follow up appointment with her orthopedist.  (AR 1642–46.)  She complained of pain in her left knee that radiates to the left ankle.  (AR 1642.)  On examination, Plaintiff had 2 to 125 degrees range of motion in her left knee, with full strength, intact sensation, full and symmetrical reflexes, and a normal gait.  (AR 1644, 1645.)  X-ray imaging showed no change in positioning of the prosthetic in Plaintiff's left knee.  (AR 1646.)  The

orthopedist noted that Plaintiff's left knee X-rays "look good" without any sign of loosening, periprosthetic fracture, or dislocation. (AR 1646.)

Plaintiff sought a surgical consultation for her thoracic spine pain in April 2021. (AR 1638–41.) The surgeon noted that Plaintiff was neurologically stable with mild hyperreflexia. (AR 1640.) He posited that Plaintiff "may or may not have intradural pathology at T5-T6," and recommended a thoracic myelogram and post myelographic CT scan. (AR 1640.) The imaging showed mild degenerative changes in the mid thoracic spine and no focal disc herniation or central canal stenosis, but ventral deviation of the spinal cord at the T6 level. (AR 1497–99.) The surgeon observed that the scan "confirms a dorsal T6 arachnoid cyst with spinal cord compression." (AR 1485, 1487.)

In May 2021, Plaintiff underwent a partial laminectomy at T5–T6 and T7. (AR 1697–32.) She reported, prior to the surgery, that she was independent with mobility and activities of daily living without use of an assistive device. (AR 1723.) Following surgery, Plaintiff performed physical therapy in the hospital using a front-wheeled walker. (AR 1728.) Upon discharge, the surgeon indicated Plaintiff could perform activity "as tolerated." (AR 1700.)

**B.     Plaintiff's Statements**

In November 2018, Plaintiff completed an adult function report. (AR 265–73.) She reported that during a typical day she makes breakfast, takes her son to and from school, watches television, cleans the house, makes dinner, she takes care of her two children, ages four and 13. (AR 266.) She described difficulty dressing, bathing, and performing other personal care activities, but she did not indicate needing help to do these activities. (AR 266–67.) As for meals, she prepares "everything" from simple meals to "multicourse dinners," does dishes, does laundry, sweeps, and picks up, but her son helps with chores. (AR 267.) She does not perform yard work or heavy chores. (AR 268.) She drives and she is able to go out alone, but reported having someone with her in case she falls. (AR 268.) She shops in stores for groceries and household items weekly and she is able to pay bills and handle finances. (AR 268.) She reported that she has not done hobbies such as crocheting, sewing, reading, crafting, or baking in a "long time." (AR 269.) She spends time with others on social media, texting, on the phone, and in person, and she takes her son to preschool and visits family. (AR 269.)

6

Plaintiff completed another adult function report in March 2019, wherein she described similar daily activities. (AR 294–301.) A typical day consisted of resting in the morning, taking pain medication, dropping off and picking up her son at an afternoon preschool, and possibly a few light household chores. (AR 295.) She bathed her four-year-old and prepared small meals, but her 13-year-old son did chores she struggled to do such as washing dishes, laundry, and making dinner. (AR 295.) Everyday tasks, standing, walking, and bending caused Plaintiff pain. (AR 295.) Plaintiff's contribution to household chores was limited to folding some laundry and doing dishes. (AR 296) She can drive a car for short periods and do grocery shopping. (AR 297.)

**C.     Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on January 14, 2019, and again on reconsideration on May 1, 2019. (AR 20, 115–119, 121–25.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 126–42.) At the hearing on June 22, 2021, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 51–78.)

   **1.     Plaintiff's Testimony**

Plaintiff testified that she recently had surgery on her thoracic spine. (AR 57–58.) Prior to the surgery, she had pain in her back all day with pain down both legs and radiating to her shoulders. (AR 61–62.) She testified she has numbness and a burning sensation from her shoulder to her hand, and loss of strength in her right hand. (AR 62.) According to Plaintiff, she can sit for 30 minutes before she has to lie down. (AR 64.) She testified she lies down for quite a bit of the day and elevates her legs. (AR 64.) She still has problems with her left knee and she has difficulty standing for long periods of time. (AR 64.) She can lift five pounds, which is limited by pain in her back and shoulders. (AR 65.) Plaintiff testified she takes pain medication twice a day, which takes away some but not of the pain. (AR 67.) She does not have medication side effects, but the pain medications make her sleepy once in a while. (AR 67.) According to Plaintiff, before her recent surgery she used a crutch that was prescribed by a doctor for a fractured femur, and she has had a cane since 2010. (AR 63, 70.) Plaintiff testified she hasn't been able to perform any physical activity since 2010, and that at that time she was limited to lifting and carrying 20 pounds, yet she admitted

that during the time period from 2011 to 2017, she occasionally lifted up to 40 pounds at her workplace.  (AR 66, 68, 69, 70.)

Plaintiff testified that prior to her recent back surgery she did not do any cooking or cleaning, and she could only dust.  (AR 63.)  She testified that during a typical day she sits and lies down most of the day, she showers every two to three days, she picks up a few toys, and she makes simple meals for her seven-year-old, but she cannot vacuum or clean.  (AR 65–66.)  According to Plaintiff, she does not take seven-year-old to school, but she takes him to the bus stop and picks him up.  (AR 66.)  She testified that she could drive short distances, which she defined as 20 miles, but not long distances.  (AR 66.)  At that time of the hearing, she had lived with her sister for 11 days and her sister does all of the household cleaning and helps take care of Plaintiff's seven-year-old.  (AR 67.)  According to Plaintiff, before she lived with her sister, her sister would come every three months and do a deep cleaning of her house, or her son would do it.  (AR 68.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a medical assistant and a front office receptionist.  (AR 72–73.)  The ALJ asked the VE to consider a person of Plaintiff's age, education, and past work history.  (AR 73.)  The VE was also to assume this person is limited to a sedentary exertional level, and would also be limited in that she could only occasionally climb ramps or stairs, only occasionally balance, stoop, kneel, crouch or crawl, and never climb ladders, ropes or scaffolds.  (AR 73.)  The VE testified that such a person could perform the front office receptionist position as generally performed, and other sedentary jobs in the national economy, such as appointment clerk, Dictionary of Operational Titles (DOT) code 237.367-010 with a specific vocational preparation (SVP)[3] of 3; document preparer, DOT code 249.587-018 with an SVP of 2; and charge account clerk, DOT code 205.367-014 with an SVP of 2.  (AR 73–74.)  The additional limitation that the hypothetical person could only sit for up to 30 minutes followed by a one-minute change in position, so long as they are on task and productive during that one minute,

---

[3] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id*.

would not change the VE's conclusion.  (AR 74–75.)  A five-minute change in position, in which such person is not productive, would be work preclusive.  (AR 74–75.)  The VE further testified that missing three days of work per month is also work preclusive.  (AR 75.)

**D.      The ALJ's Decision**

In decision dated July 29, 2021, the ALJ found that Plaintiff was not disabled.  (AR 20–43.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520.  (AR 22–43.)  The ALJ decided that Plaintiff met the insured status requirements of the Act through September 30, 2023, and she had not engaged in substantial gainful activity since March 28, 2017, the alleged onset date (step one).  (AR 22.)  At step two, the ALJ found Plaintiff's following impairments to be severe: a spine disorder, reconstructive surgery of the left knee, dysfunction of major joints, and obesity.  (AR 23–27.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 27–28.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and applied the assessment at steps four and five.  *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that, through the date last insured, Plaintiff had the RFC:

> to perform sedentary work as defined in 20 [§] CFR 404.1567(a) except that she can occasionally climb ramps and stairs, and can have no requirement to climb ladders, ropes, or scaffolds.  She can only occasionally balance, stoop, kneel, crouch, and crawl.  She can sit for up to 30 minutes, followed by a one-minute change in position, before returning to a seated position.

(AR 24–31.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause some of the alleged symptoms[,]" they rejected Plaintiff's subjective testimony

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id*.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006).

9

as "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 29.) The ALJ determined that Plaintiff was unable to perform her past relevant work (step 4), but was not disabled because, given her RFC, she could perform a significant number of other jobs in the local and national economies, specifically office worker, information clerk, and mail sorter (step 5). (AR 34–35.) The ALJ concluded Plaintiff was not disabled at any time from March 28, 2017, through the date of the decision. (AR 43.)

Plaintiff sought review of the ALJ's decision before the Appeals Council, which denied review on September 12, 2022. (AR 5–11.) Therefore, the decision became the final decision of the Acting Commissioner. 20 C.F.R. § 404.981.

### III.     LEGAL STANDARD

**A.     Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they] are not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If

> not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.") (citations omitted).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

**IV. DISCUSSION**

Plaintiff contends that the ALJ failed to articulate clear and convincing reasons for discounting Plaintiff's statements. (Doc. 13 at 47–56.) The Acting Commissioner responds that the ALJ properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and limitations. (Doc. 17 at 5–11.) The Court agrees with the Acting Commissioner.

**A.    Legal Standard**

The test for deciding whether to accept a claimant's subjective symptom testimony turns on whether the claimant produces medical evidence of an impairment that reasonably could be expected to produce the symptoms alleged. *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *Smolen v. Chater*, 80 F.3d 1273, 1281–82 & n.2 (9th Cir. 1996). The Commissioner may not discredit a claimant's testimony on the severity of

12

symptoms merely because they are unsupported by objective medical evidence. *Reddick*, 157 F.3d at 722*; Bunnell*, 947 F.2d at 343, 345. If the ALJ finds the claimant's testimony not credible, the ALJ "must specifically make findings which support this conclusion." *Bunnell*, 947 F.2d at 345. The ALJ must set forth "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Bunnell*, 947 F.2d at 345-46. Unless there is evidence of malingering, the ALJ can reject the claimant's testimony about the severity of a claimant's symptoms only by offering "specific, clear and convincing reasons for doing so."[5] *Smolen*, 80 F.3d at 1283-84; *see also Reddick*, 157 F.3d at 722. The ALJ must identify what testimony is not credible and what evidence discredits the testimony. *Reddick*, 157 F.3d at 722; *Smolen*, 80 F.3d at 1284.

**B.     Analysis**

As noted above, in determining Plaintiff's RFC, the ALJ concluded that Plaintiff's medically determinable impairments reasonably could be expected to cause the alleged symptoms. (AR 29.) The ALJ, however, also found that Plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were "not entirely consistent" with the medical record. (AR 29.) Because the ALJ did not make any finding of malingering, the ALJ was required to provide clear and convincing reasons supported by substantial evidence for discounting Plaintiff's subjective symptom allegations. *Smolen*, 80 F.3d at 1283-84; *Tommasetti*, 533 F.3d at 1039–40. Here, the ALJ provided valid reasons for not fully recrediting Plaintiff's statements.

**1.     Plaintiff's Inconsistent Statements**

The ALJ discounted Plaintiff's subjective complaints based on inconsistent statements made at the hearing and in prior statements. (AR 32–33.) General inconsistent statements—even those unrelated to the claimant's symptoms—can provide a permissible basis to discredit a claimant's lay testimony. *See Thomas*, 278 F.3d at 958–59 (inconsistencies in a claimant's testimony may be used to discredit subjective complaints); *Light*, 119 F.3d at 792 ("An ALJ's finding that a claimant generally lacked credibility is a permissible basis to reject excess pain testimony."); *see also Smolen*,

---

[5] The Court disagrees with the Acting Commissioner that a lesser legal standard applies. (*See* Doc. 17 at 6 n.1.)

80 F.3d at 1284 (ALJ may rely on ordinary techniques of credibility evaluation including prior inconsistent statements or statements that are less than candid); *Fair v. Bowen*, 885 F.2d 597, 604 n.5 (1989) (an ALJ can reject pain testimony based on contradictions in plaintiff's testimony).

The ALJ identified two categories of inconsistent statements made by Plaintiff. Each represents a clear and convincing basis to reject Plaintiff's credibility. First, the ALJ found that Plaintiff's "hearing testimony about her limited activities is not persuasive because it is not consistent with her earlier statements about her daily activities." (AR 32.) Plaintiff's disability reports dated November 2018 and March 2019 indicate Plaintiff engaged in daily activities such as caring for her young son, driving her older son to school, performing personal care, preparing meals, washing dishes, doing laundry, sweeping floors, shopping for groceries, and visiting family. (AR 266–69, 295–97.) In December 2018, Plaintiff told the consultative examiner that she does not need help with bathing, dressing, or grooming, and she can travel alone, manage money, prepare food, do light chores, and care for her children. (AR 1674.) Plaintiff reported to her treatment providers in 2019 that she did laundry, washed dishes, attended a monster truck show, climbed stairs, went school shopping, and walked an hour. (AR 1168, 1556, 1560, 1577.)

At the hearing Plaintiff provided testimony that directly contradicts these statements. She testified that, before her recent back surgery, she did not do any cooking or cleaning, only dusting (AR 63), and that she hasn't been able to perform any physical activity since 2010 (AR 66). Plaintiff asserts that no inconsistency exists because the hearing testimony and the prior reports were given at "different points in time" (Doc. 13 at 54), but this argument is misplaced. While the hearing was conducted in 2021, the contradictory testimony given by Plaintiff pertained to the period from the year 2010 and onward, which encompasses Plaintiff's prior statements made in 2018 and 2019.

The second category of inconsistent statements identified by the ALJ, which Plaintiff does not address in her brief, are the contradictions in her hearing testimony. Plaintiff initially testified that since 2010 she has been limited to lifting and carrying 20 pounds (AR 69), but later admitted that she occasionally lifted 40 pounds while at work from 2011 to 2017 (AR 70). Her testimony about her inability to perform any physical activity after 2010, described above, directly contradicts her hearing testimony that she engaged in substantial gainful activity from 2011 to 2017 (AR 59,

60).

In sum, Plaintiff's testimony that she was severely limited in her physical abilities after 2010 appears to be an exaggeration in light of her other statements and testimony regarding her activities during that period, and this is a clear and convincing reason by the ALJ to discredit her lay statements regarding the extent of her limitations and symptoms.

### 2.     Plaintiff's Activity Level

The ALJ also determined that Plaintiff "engages in daily activities which show that she is able to perform at least sedentary work on a regular basis." (AR 32.) An ALJ may properly consider a claimant's daily activities when evaluating credibility. *Fair*, 885 F.2d at 603 (the nature of daily activities may be considered when evaluating credibility). Moreover, in evaluating a claimant's credibility, an ALJ may consider inconsistencies between the claimant's testimony and the claimant's conduct and whether the claimant engages in daily activities inconsistent with the alleged symptoms. *Molina*, 674 F.3d at 1112. Even where those activities suggest some difficulty functioning, they are grounds for discrediting Plaintiff's testimony to the extent that they contradict claims of a totally debilitating impairment. *Id.* at 1113.

The Court finds that Plaintiff's above-described daily activities reported in 2018 and 2019 tend to suggest, as the ALJ concluded, that Plaintiff may still be able to perform, on a sustained basis, the basic demands of the representative occupations identified by the ALJ (*see* AR 35). *See Fair*, 885 F.2d at 603 (finding that if a claimant has the ability to perform activities "that involved many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent her from working"); *see also, e.g., Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the ALJ sufficiently explained their reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband managing finances); *Morgan*, 169 F.3d at 600 (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility); *Kelly v. Astrue*, 471 F. App'x 674, 677 (9th Cir. 2012) (holding that ALJ properly made an adverse credibility finding

because, in part, claimant's daily activities included driving, washing the dishes, shopping, and caring for her two children); *Nelson v. Colvin*, No. 1:15-cv-00696-SKO, 2016 WL 3407627, at *20 (E.D. Cal. June 20, 2016) (ALJ properly discredited subjective complaints of claimant who suffered from chronic back problems where claimant engaged in activities such as preparing simple meals, washing dishes, driving a car, shopping for groceries and household supplies 2–3 times a week, walking up to a mile, using a computer for about half an hour at a time, visiting with family, mopping and vacuuming, independently handling her own finances, and doing yoga tapes at home.).

As Plaintiff points out, the record also contains some contrary evidence, such as Plaintiff's statements that her ability to perform some household chores is hindered by pain. (*See, e.g.,* AR 266, 267, 295, 296.) Yet the ALJ's decision properly recognized that Plaintiff has some work limitations because of such pain. (*See* AR 28, 29 (assessing an RFC for sedentary work with limitations, noting that Plaintiff "has multiple impairments that limit her ability to work to some extent"); AR 31 ("[Plaintiff's] chronic pain reasonably limits her to sedentary work").) The Court concludes, however, that the ALJ properly discredited Plaintiff's testimony that her pain renders her ***completely*** unable to work. *Fair*, 885 F.2d at 604; *see also Bunnell*, 947 F.2d at 346 ("So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence."). Where the ALJ makes a reasonable interpretation of Plaintiff's testimony, it is not the Court's role to second-guess it. *Rollins*, 261 F.3d at 857 (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all the activities and noting that the ALJ's interpretation "may not be the only reasonable one").

### 3. Inconsistency with Medical Evidence

Finally, the ALJ concluded "the weight of the [medical] evidence shows that [Plaintiff] is capable of sedentary exertion work, despite her impairments." (AR 29.) The ALJ specifically found that "the medical evidence shows that [Plaintiff] experienced significant improvement in her pain, range of motion, strength, and ability to ambulate after her knee surgery, which supports a finding that this condition is not disabling," and "the weight of the available medical evidence suggests that

she will recover appropriately following [Plaintiff's recent thoracic spine surgery]." (AR 30, 32.) Plaintiff does not dispute these findings, but contends instead that improvement to Plaintiff's knee and back pain "does not negate prior disabling symptoms," citing *Smith v. Kijakazi*, 14 F.4th 1108, 1114 (9th Cir. 2021). (Doc. 13 at 50–53.)

*Smith* is the latest decision in a line of cases acknowledging that symptoms fluctuate over time for many individuals with mental health conditions. 14 F.4th at 1115. Since Plaintiff challenges the ALJ's evaluation of her physical conditions, it is questionable where *Smith* applies to this case. *See, e.g., Wendi M. v. Comm'r, Soc. Sec. Admin.*, No. 1:21-CV-01828-HZ, 2023 WL 315519, at *9 (D. Or. Jan. 18, 2023) ("Plaintiff challenges the ALJ's consideration of her physical conditions, and the Court does not believe that *Smith* applies here."). Even if it did, here, unlike in *Smith*, the ALJ did consider evidence of Plaintiff's symptoms prior to her surgical procedures in assessing Plaintiff's credibility, including that which Plaintiff cites in her brief and is summarized above (*see* Section II.A., *supra*).[6] (*Compare* AR 29 *with* Doc. 13 at 50–52; *compare* AR 30 *with* Doc. 13 at 52–53.)

Contrary to Plaintiff's characterization, there was nothing "selective" about the ALJ's analysis. Yet, any error in this regard would be harmless because the ALJ articulated other clear and convincing reasons, namely Plaintiff's inconsistent statements and her activity level as discussed herein, to discredit Plaintiff's statements. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (that some reasons for discrediting claimant's testimony should be properly discounted does not render ALJ's determination invalid so long as that determination is supported by substantial evidence); *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

## V.  CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore

//
//
//

---

[6] The ALJ also considered Plaintiff's statements and hearing testimony about her pre-surgery condition, as discussed above. (*See* Section IV.B.1, supra.)

AFFIRMED. The Clerk of Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **December 14, 2023**                         /s/ *Sheila K. Oberto*
                                                                           UNITED STATES MAGISTRATE JUDGE